**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 21-CR-589 (RDM)** |
| | : | |
| **JOHN RICHTER,** | : | |
| | : | |
| | : | |
| Defendant. | : | |

<u>**Sentencing Memorandum**</u>

*Could a greater miracle take place than for us to look through each other's eyes for an instant?*
—Henry David Thoreau

The answer to Thoreau's question is surely "no." But such miracles can, and do, happen. And if such a miracle happens here, in the context of these sentencing proceedings, what seems inexplicable and unforgiveable becomes fathomable and redeemable. Such a miracle allows us to see how John Richter, the human being, ended up where he is today. And more importantly, it allows us to understand why he will never again repeat the missteps that landed him before this Court.

John Richter has lived a life of service—service that continues to this day. He came from a family with a military tradition, and he continued that tradition. He signed up with the Army on September 10, 2001—the day before 9/11. He was seventeen when he signed up, and needed his parents' approval and signature since he was legally still a child. But he went ahead and served his country with honor. He served multiple combat tours in Iraq and endured experiences most of us would not even want to read about. John served until the Army wouldn't let him serve any longer—his injuries were too severe and his trauma was too much to overcome. The Army forced an honorable discharge on him, while certifying him as 100% disabled. John tried to reacclimate to civilian life and find meaningful employment. Unfortunately, his history of Traumatic Brain Injury ("TBI") and

1

resulting cognitive impairments, the prevalence of his migraine headaches, and the varied symptoms of his Post-Traumatic Stress Disorder ("PTSD") made it impossible for him to maintain gainful employment.

But John's service did not end when he couldn't work. Although he was certified as 100% disabled by the military, he took on another critical role—that of a husband and a father. He served as the primary caretaker to his own biological children as well as his wife's children from a prior relationship. He allowed his family to thrive by making sure the children were clean and fed, getting them to and from school, making sure their schoolwork was done, cooking meals, and all of the other activities that go along with keeping a household intact and functioning.

John's history of selflessness and service stands in stark contrast to his participation in the events of January 6th. That disconnect appears inexplicable. But a holistic review of the circumstances surrounding John leading up to January 6th provide the proper context for a greater understanding of why this happened in the first place. Viewing John's actions and motivations on January 6th in comparison to his life both before and after that one day demonstrate that his actions that day neither define nor reflect who he truly is. Further, John is a man willing to recognize his misdeeds and do all he can to avoid repeating them.

*We are all mistaken sometimes; sometimes we do wrong things, things that have bad consequences. But it does not mean we are evil, or that we cannot be trusted ever afterward.*

**—Alison Croggon**

Certainly, John Richter did wrong things. And unquestionably those things have had bad consequences—for him, his family and the for the country as a whole.  But those wrong things do

not define him, nor do they dictate that he be viewed as evil. Rather, he should be viewed as a flawed person who, in the midst of unfamiliar and chaotic circumstances, made the wrong choices.

The Court is very familiar with the facts of this case. The PSR sets forth the actions taken by others at the Capitol Building (PSR at ¶¶13-17), and the Court is probably more familiar with those facts than Mr. Richter and his counsel are, based on the number of other January 6th cases coming before the Court. The Court also paid careful consideration to the individual facts relating to John Richter's actions in this case, which are also described by the Probation Office (PSR at ¶¶18-46).[1] Mr. Richter is confident that the Court is fully aware of the facts of this case, and will not recite them once again. We do not intend to minimize those facts, or dispute them here. Rather, we intend to focus on the circumstances that led Mr. Richter to engage in the conduct leading to his misdemeanor convictions. We further seek to demonstrate (a) what Mr. Richter learned from his wrongful conduct, (b) his efforts at rehabilitation, and (c) why the Court can be confident that no similar conduct on Mr. Richter's part will ever occur again.

By all accounts, 2020 was a year unlike any other. Toward the end of the prior year, whispers and rumors became audible of some strange disease originating in China. With the arrival of 2020 came the realization that the disease was real, but optimists had hope that it would remain in China. It soon became clear that those optimists would be disappointed, as COVID began to spread across the globe—including the United States.

With COVID gaining a foothold in the United States, life for most Americans changed drastically. Workplaces largely closed their doors. While stores remained open to allow shopping for necessities such as groceries and other items, many had limitations on the number of shoppers, or set certain times reserved for certain people (the elderly, etc.) to shop. Many restaurants were limited to

---

[1] The government also offers a twenty-five page recitation of its factual background. (ECF No 186 at 2-26).

takeout orders only. Activities in courthouses were drastically curtailed. Schools were also closed, leading to millions of children transitioning to virtual school. Entertainment venues such as movie theaters, concerts halls and sporting events shut down. To a large extent, the world shut down in 2020.

When the world shut down, people were confined to a great extent to their own homes. Most people stopped visiting others in their homes, for fear that they could spread the virus to loved ones. Most of the public places people previously frequented. Generally speaking, people were forced to stay home, surrounded by only nuclear family members and their pets.

In a very real sense, 2020 was a year of isolation. People were stuck in their homes, where they were largely cut off from the outside world. The normal social avenues of work, school and recreation were shut down. In the modern 21st century, many people turned to the internet as an outlet for their lack of social activities. While the internet can be a remarkable tool, it also has a dark side—perhaps many dark sides. And one of the dark sides—which admittedly some would see as its strength—is the internet's lack of regulation. Aside from criminal prohibitions on speech not protected by the First Amendment, virtually anything goes on the internet. What people can say (and do) on the internet is largely limited only by one's imagination.

The internet differs in a significant way from other information streams such as radio and television—it is far more targeted toward the interests of its consumers. Admittedly, some news channels tend to be more liberal than others (e.g., MSNBC) while others tend to be more conservative (e.g., Fox News). But those political biases pale in comparison to the biases one sees on the internet. Fox News looks like C-Span when it is compared to Infowars. Moreover, while journalistic ethics have certainly loosened over the past few decades, they still exist among major news companies. No such restrictions seem to exist on the Wild West that is the internet. On the internet, rumors, speculation and conspiracy theories stand on equal footing with journalism—one need only search the term "Qanon" to confirm that reality.

2020 was a tumultuous and chaotic year politically as well. With the ever-expanding COVID pandemic as a backdrop, the 2020 Presidential race was as emotionally-charged and divisive as any in recent memory. The election was long on invective and short on reasoned discourse. And because most of the normal avenues of socialization were closed off, people increasingly took their political research and discussions to the internet. And the internet was ready.

The targeting effect of the internet, as mentioned above, has both an active and a passive component. An internet surfer can actively target his searches by typing in the URL for Fox News as opposed to MSNBC, or for the Wall Street Journal as opposed to the Washington Post. Now a sophisticated surfer might be aware of this targeting effect, and seek out news from multiple sources in order to lessen the effects of political biases. Or he might not because he prefers to read articles more closely aligned to his pre-existing views.

But there is also a passive targeting effect that can have even more insidious effects than the choice of typing in a particular URL. The internet and social media have become a multi-billion dollar business. And that business is often driven by "clicks". Websites keep track of how many visits their site, or even a page of their site, receives. The more "clicks," the more attractive the website is to potential advertisers. The more advertisers a website attracts, the more money the website makes. And so it goes…

So websites and social media companies are constantly tracking what webpages and articles its consumers open. And once they identify possible areas of interest by the consumer—measured by "clicks"—they use algorithms to identify other webpages and articles similar to those the user has already visited. This practice is hardly breaking news to any Facebook user. Most Facebook users know that if they click on a couple articles about a certain sports team, other articles about that sports team will start to pop up in their Facebook feed. The same phenomenon is true about highly-charged political issues such as abortion, the Second Amendment or immigration. If a Facebook user clicks on

articles about these topics, Facebook's algorithms will quickly begin to spoon-feed that user more articles about that topic. And the effect is cyclical, because the more articles the user clicks on regarding a certain topic, the more similar articles will appear in their feed, which will lead him to open more of those articles until one of the driving themes in his Facebook feed is a particular point of view about a hot-button political issue.

As mentioned, this phenomenon is not active in the same way that choosing to navigate to Fox News as opposed to MSNBC is active. The user may not be conscious of the fact that he is receiving info that algorithms believe he is preconditioned to like and accept. To the user, his feed may appear to be a stream reflecting society's views on issues. But the reality is that his feed is made up of a single viewpoint which algorithms believe he will click on, and clicks ultimately mean dollars to social media sites.

In 2020, this was the world that John Richter inhabited—a world of isolation and divisive politics. John is a self-described libertarian, and those views did not always fit neatly into our two-party system. His social views were often more on the liberal side, while his fiscal and foreign relations views tended to fall toward the conservative spectrum. By the time the 2020 Presidential campaign ramped up, John was a supporter of then-President Trump. Part of that support stemmed from John's views, and part of it stemmed from John's longstanding patriotic views. As a retired Army veteran, John took seriously the President's title as commander-in-chief. Moreover, John respected the Office of the Presidency, and trusted that his commander-in-chief would speak the truth.

John was also stuck in the echo-chamber of the internet and social media. The articles and pages that he visited were sympathetic to President Trump and his views. The more such articles he read and pages he visited, the more the various algorithms fed him other similar stories. John was also active participant in social media, producing his own videos on various sites and channels. Those viewing his content shared similar views and thus provided positive feedback, further intensifying the

effect of the echo-chamber. The more positive feedback and expressions of similar views he received, the more his own views strengthened and intensified. And so it goes…

Based on these circumstances, in the leadup to the 2020 Presidential election, John believed that President Trump would prevail. Why wouldn't he? In an atmosphere of physical isolation, his only real social outlet was the internet. The internet and social media bombarded him with pro-Trump stories and propaganda. He was largely oblivious to news stories and articles from moderate-to-liberal sources. And if he did see such an occasional liberal story, it could be easily written-off as patently false leftist propaganda—as least according to the right-wing sources that were his only news.

With this as a backdrop, it is easy to understand why John was shocked and believed there was mischief afoot as election results started turning toward then-Democratic Nominee Joseph Biden. It was even more shocking to John when Mr. Biden was declared the winner of the 2020 election. Everything John had been hearing, seeing and reading indicated that then-President Trump would win in a landslide. As the stories started pouring in about supposed election fraud and voting irregularities, it was only natural that John would believe those stories. And omnipresent at that time was then-President Trump, constantly pouring gasoline on the election-fraud fire.

At that time, John feared that the election was being stolen from the American people. He believed that then-President Trump had won the election, and election fraud was wrongly taking it from Trump and giving it to Biden. Unquestionably, that made John upset. He was angry. History would show that he was wrong—but at that time, his mindset was that the people's election was fraudulently being stolen.

It is important to understand that neither John Richter nor Joe Irwin were experts in election law. Yes, they sent many text messages back and forth regarding the elections, election-related lawsuits, and election certification proceedings. But a review of those texts shows that they were hardly experts in these election-related areas. Instead, they would largely parrot whatever they read from right-wing

news sites, social media posts and other similar sources. Had they critically analyzed a wide swath of articles and arguments from disparate viewpoints? Absolutely not. Instead, they accepted uncritically whatever was fed to them by Trump and his sycophants. Their texts show that they had strong opinions on the 2020 election. But strong opinions are not necessarily *informed* opinions.

Were many of their texts incendiary? Yes. But sadly, incendiary rhetoric was the norm in the leadup and aftermath to the 2020 Presidential election. Comments about the need to fight like hell and for trial by combat were all too common and were largely unavoidable. But the text messages between John and Joe that could be interpreted as violent—comments about militia, George Washington crossing the Delaware, waking the sleeping giant, etc.—were not meant to be taken as literal statements of intent. How can we know that? Because John never acted consistently with any violent interpretation.

Neither John nor Joe were involved in any planning of the January 6th rally at the ellipse or the subsequent march to the Capitol. The first they heard of the rally was when then-President Trump tweeted about it. The first they heard of the march to the Capitol was when Trump said they would all march together from the ellipse. As Joe testified, when they arrived in Washington D.C. on the morning of January 6th, they didn't even know where the rally would be held—they simply followed the crowd.

In the run-up to the rally, they had texted about gas masks, vests, and various combat-related equipment. But they brought none of it.  John brought his flag—as a political symbol, not as a weapon. The videos and photos showed thousands of flags in the crowd—surely not everyone carrying a flag intended to use it as a weapon.  At the time that John chose to bring the flag, he had no idea that they would march to the Capitol, so it would have been impossible for him to decide to bring it to use as a weapon at the Capitol. And most importantly, John never used, threatened to use or attempted to use the flag as a weapon. He had ample opportunities to use it as a weapon. Others were engaged in

violence against officers on January 6th, and John never showed the slightest inclination to join in. He never confronted officers, yelled at them, or engaged in any potentially-threatening shows of force against officers.

Admittedly, John made a number of bad choices, including his decision to enter the Capitol Building. But his actions were largely those of a trespasser. He had never been to Washington, D.C., let alone the Capitol Building. Much like when he and Joe marched to the Capitol Building, once inside the building, John simply followed the crowd. He ended up in the Senate Chamber—a room he had never been in before. When additional officers responded and ushered everyone out of the Chamber, John fully complied and exited the Capitol Building. While he was in the Capitol, he caused no damage to the building or property therein. Nor did he disturb paperwork, computers or any other property in the Senate Chamber. He was a trespasser and demonstrator, and nothing more than that.

> *That best portion of a man's life—his little, nameless, unremembered acts of kindness and love.*
> —William Wordsworth

John Richter is so much more than the person shown in the government's exhibits—exhibits which reflect but a few months of John's life. The rest of his life shows a man who was born into difficult circumstances and who has overcame difficulties on several occasions to live a life of service. And despite the trials and tribulations that he has faced, he continues to this day to serve others in whatever way he can.

John was born in 1984. His parents were not married—he was instead conceived during a one-night stand. John was given the last name of his mother's boyfriend, who was not his biological father. At the age of two, John was removed from his mother's custody because she had both abused

and neglected him. To date, he has never seen or spoken with her again. He has no idea where she is, what she is doing, or even if she is still alive.

John was ultimately adopted by the Richters. That environment was better than that provided by his biological mother—but it was far from ideal. His father had retired from the US Navy and worked at a TJ Maxx distribution center. His mother was a homemaker. He has two paternal siblings and two maternal siblings from his biological parents. Those maternal siblings were removed from the Richter home when John was a toddler due to molestation. John also has an additional five adopted siblings, who are named in the PSR. John has had no further contact with his maternal siblings since they were removed from the household. John has only learned of his biological paternal siblings in the last year. He has sporadic contact around the holidays with two of his adopted siblings but has no contact with his third adopted sibling.

John's childhood was painful. His mother was both verbally and mentally abusive. They were strip-searched upon returning home after school—and they were required to come home after school, as opposed to socializing with friends outside the home. If anyone misbehaved, she would withhold food from them to teach them a lesson. John's sister also noted that she would hold the children down and slap them, while their father would occasionally punish them with his belt. John's mother was cold and distant. Love was not present in the house. The situation was all the worse because she ruled the house. John's father deferred to his wife, and never intervened to stop his wife's harsh discipline. John's father was more of a passive observer than an active participant in family life. This family discord spread throughout the family. There was not great love and closeness between John and his siblings, all of whom likely adopted an attitude of survival of the fittest.

John's mother died in 2011 while his father died in 2020. John has sporadic contact with two siblings, and no contact with the others—whom he describes with the single word "awful." Family is

supposed to provide us with refuge, support and love. John's provided him with pain, criticism and disdain. What John has accomplished in life, he has truly earned on his own.

Perhaps in an effort to escape his family, and equally motivated by a desire to serve a calling greater than himself, John joined the Army on September 10, 2001. John served for eight years until he received an honorable discharge due to injuries sustained while serving—both physical and psychological injuries. John served two tours in Iraq during that time, and experienced combat on many occasions. Improvised Explosive Devices ("IEDs") were omnipresent, and John suffered the effects of IEDs on 29 occasions. John's military experiences cost him dearly, and yet he did not seek to leave the Army—the Army ultimately forced him to accept an honorable discharge based on his injuries and those injuries' effects on his ability to continue serving his country.

John's significant volume of medical records[2] demonstrate John's history of mental disorders, including posttraumatic stress disorder (PTSD) and traumatic brain injuries (TBIs) that occurred during multiple deployments to Iraq while enlisted in the United States Army. John was referred from the Ireland Army Hospital for a neuropsychological evaluation in 2009 due to "difficulties in cognitive functioning, including diminished attention and concentration, and short-term memory problems as well as PTSD issues, secondary to exposure to IED blasts." He was evaluated and presented with anterograde memory problems. Additionally, he presented with symptoms of PTSD related to his combat experiences that included witnessing multiple violent deaths and the loss of his best friend from his platoon on Memorial Day. During the evaluation, it was found that he had sustained a Traumatic Brain Injury, with bilateral frontotemporal involvement, secondary to exposure to IED blasts during multiple deployments to Iraq. He was

---

[2] These records have previously been delivered both to the government and to the United States Probation Office.

diagnosed with Cognitive Disorder Not Otherwise Specified (bilateral frontotemporal lobe involvement), Posttraumatic Stress Disorder, Chronic, and Bereavement.

Based on that evaluation, John was deemed permanently disabled by the Department of Veterans Affairs (VA) and rated as 100% service connected for PTSD and residual traumatic brain injury (TBI) caused by battle injuries in a combat theater. VA records found permanent impairments related to occupational and social functioning, impaired impulse control, difficulties in adapting to stressful circumstances, ability to establish and maintain effective relationships, as well as impairments of memory, attention, concentration, and executive functions. He was also rated as disabled secondary to chronic migraine headaches—those migraines would ultimately lead him to consider suicide. In addition to his own exposure to IEDs, John witnessed the atrocities of combat and subsequently suffers from symptoms of PTSD that include insomnia, hypervigilance, irritability, anxiety, and the repeated, disturbing dreams of his combat experiences.

John received years of treatment for PTSD and headaches related to TBIs. He underwent prolonged exposure therapy for PTSD which was discontinued because it was too intense and worsened his symptoms. Other psychological interventions included equine therapy, group therapy, and long term individual counseling. He has undergone unsuccessful trials of multiple psychoactive medications, including Paxil, Trazadone, Clonazepam, Lexapro, Remeron, Prozac, Ativan, Buspar, and Effexor. Additionally, he was also treated with Ambien for insomnia and Prazosin for PTSD related nightmares.

A 2012 MRI of John's brain showed mild prominent perivascular spaces in the basil ganglia and right cerebellar hemisphere, as well as a Chiari malformation. He tried antiseizure medications (Dilantin and Topamax) for mood and headaches as well as multiple Botox procedures for chronic migraines. None of the treatment attempts were successful. John did find talk therapy with his counselor in Kentucky was helpful. He did exhibit suicidal ideation during a period of severe

migraines. He continued to have symptoms of PTSD (e.g., nightmares of seeing a dismembered body in a car that exploded during deployment) and flashbacks related to a Memorial Day 2007 incident when a helicopter was shot down and five people in a vehicle were killed and he watched his best friend killed secondary to an IED, finding only his legs and torso.

In terms of his everyday life, John's history of trauma manifests through significant cognitive deficits that impede his ability to manage daily affairs. His wife Megan has managed the finances and other household planning for at least five years, when the VA designated her as John's financial trustee. John had a history of forgetting to pay bills, misremembering financial transactions, and an inability to responsibly manage his disability payments and the household finances. Megan's taking charge was necessary due to John's inattention, lack of concentration, and memory problems as well as difficulties accurately recalling events or information.  John's cognitive difficulties are not limited to financial matters. His family has observed significant impairments in John's ability to remember recent conversations and events. Megan frequently corrects John about the details of events or situations.

But for John's Army service, he would not have suffered these physical, mental and psychological injuries. Those injuries have not completely healed over the last fifteen years, nor are they likely to ever do so. And yet, John has never regretted his military service. He remains, to this day, proud of his country and believes that all citizens should do their duty. And since his separation from the Army, John has done what he could to try to build a meaningful life for himself—a life with love and family support.

John has always wanted to have the stable, loving family that he lacked as a child. After he returned to the United States from Iraq, he tried to build that family with Heather Graves. They were married from 2008 and 2012. Ultimately, they divorced because they were "incompatible"—but that is a polite description of the reasons. Ms. Graves was both unfaithful to John and neglectful to their

son and daughter. As a child, John has experienced both abuse and neglect. He was determined not to subject his children to similar treatment. He did the only thing he could do to make life better for his children—he ended his marriage to Ms. Graves and fought for full custody of his daughter and son, and he was ultimately successful in convincing a court to give him full custody.

In 2014, John married his current wife Megan. Together, John and Megan have built a true blended family. Together, they have welcomed two children—a ten-year old daughter and a six-year old son. Megan also has two sons from a prior relationship—ages nineteen and sixteen. The nineteen year old lives with John and Megan, while the sixteen year old lives with his father. In sum total, John's two children with Ms. Graves, John and Megan's two children together, and Megan's nineteen year-old son all live under John and Megan's roof. They live together as a family—not as step-children, step-siblings and step-parents—but as a family of parents, sons and daughters and brothers and sisters.

John's family life has not been perfect, but as a family they have persevered. His daughter with Ms. Graves has Stickler Syndrome which has caused detached retinas. She is legally considered blind, although with corrective lenses she is able to see some. With such a large family, money is not always in abundance. They depend on John's military retirement pay for the bulk of their income, although Megan's earnings as a food server are also important. John's military benefits including health insurance are their sole source of benefits for the entire family.

As documented herein and in the PSR, John's injuries have led him to be certified as 100% disabled based upon his military service. After his military service ended, John tried to find gainful employment—both to support his family and because he believed in in earning his keep through an honest day's work. Unfortunately, his broken body and cognitive deficits made such employment impossible.

While others experiencing John's traumatic childhood followed by his military service and the injuries sustained therefrom might throw in the towel, John did no such thing. He looked for other

ways that he could serve—in this case, serve his family. John became, in every sense of the word, a homemaker. He took primary responsibility for getting up with the children—one of whom rises by 5:15 AM every morning, a time at which John is wide awake as well. He makes multiple trips each morning to get the kids to their various different schools. He does activities such as food shopping and chores around the house such as cleaning and other home projects. Toward the end of school, he the pattern repeats and John is responsible for picking up the children from school and driving them home. Once home, the homework routine occurs, as well as any chores. John also ensures that dinner is ready for all. Megan heads to work during late afternoon and evening, which leaves John with primary responsibility for bedtime routines including bath/shower time, etc.

Unquestionably, Mr. Richter's conduct which led to this case has caused hardship for his family. John and Megan's lives have become far more stressful—they fear what consequences may come, and they have endured additional financial hardship from repeated and extended travel to Washington, D.C. for court proceedings. John and Megan have tried to be honest with their children about John's actions and this case. That process has been hard, because the reality that John may be incarcerated is difficult for adults to deal with, let alone his children. It has also been particularly painful for John to discuss, because he has had to come to grips with the disappointment and anguish he has caused to those he loves the most—his wife and children.

John's actions and this case have brought fear into their lives—fear of the unknown, and fear of dislocation. John's family relies primarily on his retirement and his health benefits. While Megan's wages are important, on their own, Megan's wages are simply insufficient to sustain her family's living expenses. As set forth in the Presentence Investigation Report ("PSR"),[3] if Mr. Richter is incarcerated

---

[3] *See also, e.g.,* https://www.benefits.va.gov/persona/veteran-incarcerated.asp (last accessed December 5, 2024).

in jail or prison for sixty days or more, his military benefits will be cut off.[4] While it is possible that those benefits could be reinstated upon Mr. Richter's release, such reinstatement is not guaranteed. Instead, Mr. Richter would have to reapply for disability status in the hope that he would once again be certified as disabled. Presumably he would eventually be re-certified, but whether re-certification would take months or years is anybody's guess.

He family's fears are real however. Should John be incarcerated for sixty days or more, military benefits will be cut off and Megan will be unable to keep up with their bills. The mortgage will go unpaid and they will be foreclosed upon. Megan and the children (and eventually John upon his release) will be homeless without benefits.[5] They have no family in Florida so there is no immediate local refuge for the family.

Despite the hardship, anxiety and fear plaguing all their minds, the family endures. Megan and the children remain supportive of John, and he of them as well. They have and will continue to persevere. That they remain supportive of each other under difficult circumstances, and in spite of the harm resulting from John's bad choices, is a testament to the love and devotion they feel for each other. John has succeeded in building the true family that his parents failed to provide for him and his siblings.

The government focuses largely[6] on one day in John's life, to the exclusion of the other 14,361 days of his life. That hyperfocus is truly myopic. A reasonable sentence in this case should examine what John was *actually convicted of* in the context of his life as a whole—as opposed to looking only at

---

[4] It appears, however, that payments are not reduced for veterans participating in work release programs, residing in residential re-entry centers, or under community supervision. *Id.*

[5] Additionally, John and Megan's son has a girlfriend and child, who also live in the residence.

[6] Admittedly, the government does cite to texts occurring during the leadup to January 6th, and several days thereafter. But that only adds about another 60 days, as opposed to the other 14,300 days of John's life.

what John did on January 6th. A picture truly speaks a thousand words, and sometimes visual aids such as this say more than mere words can convey:



Now look again at this picture—what do you see? Most of us see a black dot. But focusing on the small black dot to the exclusion of all of the white space surrounding it misses almost the entirety of the picture. That it what the government asks the Court to do—focus on one day (or even three months) to the exclusion of the rest of John's life. Focusing solely on the dot misses the rest of the picture. Focusing solely on January 6th misses the mosaic that is John's life. Thankfully, 18 U.S.C. §3553(a) requires a more holistic focus than that employed by the government.

*Punishment is not prevention. History offers cold comfort to those who think grievance and despair can be subdued by force.*

**—Robert F. Kennedy**

The government argues that the appropriate punishment for John Richter is twenty months' incarceration, followed by thirty-six months' supervised release, $2,000 in restitution and an $80 special assessment. The government's Draconian suggestion as to an appropriate sentence is not warranted by law, the guidelines or principles of fairness and justice. Nor is it necessary to prevent John Richter from repeating such conduct, for John Richter no longer sees himself as aggrieved nor does he despair. The John Richter facing the Court on December 20th is truly rehabilitated.

As an initial matter, the government's suggestion of thirty-six months of supervised release does not comport with the law. The maximum term of supervised release for Counts Three and Five, as faced by John Richter, is one year. 18 U.S.C. §3583(b)(3). Counts Six, Seven and Eight are petty offenses and thus supervised release is not an option. 18 U.S.C. §§19, 3583(b)(3). Multiple terms of supervised release shall run concurrently. 18 U.S.C. §3624(e). *See also* PSR at ¶¶164-166. The supervised release portion of the government's request is simply unlawful. It is also noteworthy that the government's request for incarceration, as opposed to the requests contained herein, substantially decrease the amount of supervision the Court can impose on Mr. Richter. The probationary term requested herein allows for up to five years of supervision, as opposed to the one-year term the government's request would allow.

In evaluating the substance of the government's arguments, it appears hardly accidental and more obviously calculated, that the government chose to submit a joint sentencing memorandum for both Mr. Richter and Mr. Irwin. Substantial portions of that memorandum apply solely to Mr. Irwin,

as opposed to Mr. Richter. (*See, e.g.,* ECF No. 186 at 8-9,[7] 14, 15, 16-17, 22-26). It is axiomatic that John is entitled to an individualized sentencing hearing based upon his conduct in this case. But by filing a joint memorandum with extensive arguments applicable only to Mr. Irwin, it appears that the government may hope to create a "spillover" effect by which the punishment handed down to Mr. Richter is heavily influenced by actions of Mr. Irwin which are not properly considered against Mr. Richter.

This danger is further heightened by the reality that Mr. Irwin and Mr. Richter are found in significantly different sentencing postures. Mr. Irwin stands convicted of two separate felonies, while Mr. Richter stands convicted of only misdemeanors—three of which are considered "petty offenses". The PSR correctly places Mr. Richter in a 0-6 month guideline range, while the government erroneously argues that a higher guideline range should apply.[8] According to both the law and the Sentencing Guidelines, Mr. Richter and Mr. Irwin face significantly different punishments. It is apparent from its memorandum that the government does not approve of the ranges and statutory maximums Mr. Richter based on what he was actually convicted of, and therefore the government endeavors to present Mr. Richter and Mr. Irwin as having engaged in identical conduct—a presentation which is simply not true.[9]

---

[7] The government appears to insinuate that John should be held responsible to some degree for Mr. Irwin's confrontation with law enforcement during which Abel was broken. As demonstrated during trial, Mr. Richter simply stood behind Mr. Irwin while that encounter occurred—without saying anything or doing anything.

[8] Mr. Richter incorporates by reference all of the argument contained in his Motion to Strike as if reprinted *verbatim* herein, including assertions of waiver regarding guideline issues.

[9] Nothing said herein should be interpreted as recommending or advocating a particular sentencing outcome for Mr. Irwin. Mr. Irwin is ably represented at sentencing by skilled counsel who will make appropriate recommendations on his behalf. Mr. Richter only asks that he be sentenced based on *his* individual conduct and the individual facts and circumstance of *his* case, and not based on the facts on circumstances of anyone else's case.

It is also instructive that the government seeks to argue in the aggregate, as opposed to tailoring its recommendation to Mr. Richter specifically. For example, the government cites to the fact that the Capitol sustained $2.9 million in losses. (ECF No. 186 at 2). John does not dispute that number as accurate. He notes, however, that there is no evidence in the record that John's actions caused any damage to the Capitol. He destroyed no property, he took no documents and he defaced nothing. Nor did he engage in any violence or threatening conduct which victimized "MPD victim officers." (ECF No. 186 at 2 & fn. 1). All John asks is that his sentence be based on what he did, as opposed to what others did.

In a further attempt to justify an unjustified sentence, the government focuses largely on what John Richter said before (and to a lesser extent after) January 6th, rather than on what he did on January 6th. He stands convicted of entering and demonstrating in a restricted building, entering the floor of Congress, and disorderly conduct and demonstrating in the Capitol Building. He stands convicted of those offenses because that's what he did, and he doesn't contest that. But the government is unsatisfied with the punishment he faces for what he **did**, so instead the government focuses on what he **said** before and after January 6th. *See, e.g.,* ECF No. 186 at 3-6. Now, John is not proud of his words, and as demonstrated in his supplemental sentencing video, he would not say those things again and he has markedly changed his behavior both online and in the real world. But many of the words cited by the government are inflammatory rhetoric that John never intended to carry out. On January 6th, John was not violent. On January 6th, John didn't bring gas masks, goggles, battery banks or any other combat gear and weaponry (*See* ECF No. 186 at 6). Yes, he brought his flagpole (ECF No. 186 at 5)— as a political symbol, not a weapon. This Court has already acquitted him of carrying that flagpole as a dangerous weapon.[10]

---

[10] Considering acquitted conduct for guidelines purposes is erroneous, and we assert it would be erroneous to base requests for a drastic upward departure/variance on acquitted conduct. *See, e.g.,*

In discussing the John's conduct on January 6th, the government intersperses the fact that John occasionally banged his flagpole on the ground and/or chanted (*see, e.g.,* ECF No. 186 at 11) with the testimony that officers found such conduct threatening. (*see, e.g.,* ECF No. 186 at 14). It is understandable that large numbers or people engaging in disorderly conduct could be perceived by officers as threatening. But that officers felt threatened does not mean that John intended to threaten anybody. He didn't intend to threaten anyone, and he didn't actually threaten anyone. Yes, he engaged in disorderly conduct while demonstrating in the Capitol Building. He is prepared to be sentenced for that conduct—but he should be sentenced based on what he intended and what he did, and not how others felt.

The government further intersperses the actions of "the mob" while in the Senate Chamber with John's conduct in the Senate Chamber. (*See, e.g.,* ECF No. 186 at 16).[11] Doing so is unfair. John was largely quiet while in the Senate Chamber, with the exception of his response "And A-woman" at the end of the Qanon Shaman's prayer. He made no vocal pronouncements to incite or encourage anyone to do anything. He never stepped up on the Senate Dais, as others did. He did not touch, photograph or otherwise harm computers, paperwork or any other property while in the Senate Chamber. He looked around, bowed his head in prayer, quietly sat down at a desk and allowed his

---

U.S.S.G. §1B1.3(c)).

[11] This effort to blame John for the actions of others is not limited to events in the Senate Chamber. The government seeks to hold John responsible for "threatening the lives of legislators and their staff" as well as injuries to "more than one hundred police officers" and "2.9 million dollars in losses." (ECF No. 186 at 35). John threatened no one's life, injured no one and cause no property damage.

The government's citation to a child pornography case in an effort to justify its request for restitution here fails. (CEF No. 186 at 59-60). Child pornography cases are subject to specific statutes and precedent in computing restitution amounts that are simply inapplicable here. *See generally* 18 U.S.C. §2259; *Paroline v. United States*, 572 U.S. 434 (2014).

picture to be taken. Should he have done that? Absolutely not. Should he have been there? Clearly the answer is "no." But he should be sentenced based on his conduct and not the conduct of others.[12]

The government also argues that John Richter obstructed justice by lying to the Court when seeking a mistrial and/or a continuance mid-trial. (ECF No. 186 at 20 & fn. 3; *see also, e.g.,* ECF No. 186 at 25). That is not true. Mr. Richter never told the Court that he forgot anything. Undersigned counsel stated what he preliminarily understood the facts may be, and then opined about the need to obtain an expert to consult about those purported facts. (*See, e.g.,* January 23, 2024 transcript at 193-95, 196-97, 198-99, 201; *see also, e.g.,* January 24, 2024 transcript at 412-27). The representations made on the record on Mr. Richter's behalf were those of counsel's preliminary understanding regarding the need for expert testimony.  Mr. Richter never "attempted to use these diagnoses [of TBI and PTSD] to their advantage at trial"[13] because he never tried to introduce such evidence at trial, nor did he offer his own testimony or testimony from anyone else at trial regarding TBI or PTSD. The requests for mistrial and a continuance were based on the legal reality that undersigned counsel had inadequately prepared for trial.

Equally important is the fact that Mr. Richter (a) never testified at trial, nor (b) did he present any expert testimony. In other words, he never presented evidence of what he knew or remembered. The government's claim that John Richter "boldly lied again to this Court at trial" is belied by the record. (*See* ECF No. 186 at 20 & fn. 3). If the government is asserting, however, that it was **<u>undersigned counsel</u>** who "boldly lied again to the Court at trial when they sought a mid-trial continuance," since undersigned counsel is the only one that discussed these issues on Mr. Richter's

---

[12] While John entered the Senate Chamber, the talismanic effect the government ascribes to that fact (*see, e.g.,* ECF No. 186 at 36 & fn. 7) is not warranted by the evidence, as the testimony adduced at trial indicated that the certification efforts would have been suspended if even a single trespasser remained anywhere in the Capitol Building.
[13] *See* ECF No. 186 at 49.

behalf, the appropriate remedy would not be to hold such purported misconduct against Mr. Richter by enhancing his guideline range.

Evidence regarding any purported effort to cleanse social media (*see* ECF NO. 186 at 21-22) were not made on Mr. Richter's behalf. Nor was his trial testimony impeached, since he neither testified at trial nor did he offer affirmative evidence through defense witnesses or defense exhibits. Instead, his defense was limited to demonstrating that he was not guilty of the charged felonies.

The government's arguments that Mr. Richter either used violence or made credible threats of violence are belied by the record and this Court's findings. (ECF No. 186 at 29). John did not use violence—he struck no one, he pushed no one, nor is there any evidence that he made any physical contact with any law enforcement, Capitol staff, or anyone other than Mr. Irwin. He also did not "use … credible threats of violence" because he never threatened anyone. He never uttered a threat. Nor did he point anything at anyone in a menacing manner. The government erroneously focuses on how officers subjectively felt. That is not the inquiry. The inquiry is whether John Richter "use[d]" credible threats of violence. John Richter employed neither violence nor threats of violence. He demonstrated. He was disorderly. But demonstrating in a disorderly does not a threat make. The government's claim that John used his pole in the Senate Chamber to "threaten[] violence" is belied by the Court's finding that Mr. Richter did not carry a dangerous weapon. The officer's subjective view of all poles as a threat does not mean that every person who carried a pole used it as a threat. Mr. Richter is entitled to a two-level reduction as a zero-point offender.

The government argues that sentencing Mr. Richter consecutively is legally permissible. (ECF No. 186 at 45-47). That is true. But doing so is at best employing and 'ends justify the means' rationale, as the offenses Mr. Richter stands convicted of are largely duplicative. For example, he is convicted of entering a restricted building (Count 3) and disorderly conduct in a restricted building (Count 5). How could he engage in disorderly conduct within the Capitol Building without entering it? And while

the government could argue that he could have been convicted in Count Three for entering the Capitol Building while convicted of Count Five for banging a pole against the scaffolding outside the Capitol Building, such an argument elevates form over function. The reality is that there is no separate harm emanating from Count Three as opposed to Count Five. Although not requested by the government, the harms caused by Counts Six, Seven and Eight are largely duplicative of Counts Three and Five as well. The reality is that the government doesn't like the guideline ranges called for in Mr. Richter's case, and therefore engaged in mental gymnastics divorced from the facts to reach the result it feels is appropriate.

The government's comparison with other cases is highly selective and of little weight. Unlike Mr. Black, John Richter did not defiantly shout at officers, nor did he rifle through Senate papers, take pictures of documents or pose for photos on the Senate Dais. Nor was John armed with a concealed knife. (*See* ECF No. 186 at 53-54). John engaged in none of the incitement that Jacob Chansley did, nor did he give interviews after the fact to the media. John did not threaten to cause physical injury. He is demonstrating considerable remorse. While he did not plead guilty, he stands convicted only of those offenses that he conceded at trial. (*See* ECF No. 186 at 55-56). John also never entered House Speaker Pelosi's office, nor did he force open any doors, mount the Senate Dais or sit in the Vice President's chair. (*See* ECF No. 186 at 56-57).

The government argues that Mr. Richter has not shown remorse or acknowledged the seriousness of his conduct. (ECF No. 186 at 50). Mr. Richter is submitting a supplemental sentencing video with this memorandum. He will also be speaking at his sentencing hearing. He respectfully asks the Court to assess his remorse, acceptance of responsibility and acknowledgement of the seriousness of his conduct after hearing from him at sentencing.

*If he has a conscience he will suffer for his mistake.*
*That will be his punishment—as well as the prison.*
**—Fyodor Dostoevsky**

John Richter is before the Court for sentencing on two Class A misdemeanors and three Class B misdemeanors. Based on a total offense level of eight in Criminal History I, his advisory guideline range of 0-6 months places him in Zone A. As a zero-point offender with a guideline in Zone A, a sentence of imprisonment is generally inappropriate. (U.S.S.G. §5C1.1, commentary note 10).

How much punishment is **<u>sufficient</u>** but not **<u>greater than necessary</u>** for John Richter? The probation office has recommended four months. The government feels differently and vastly more punitively. (ECF No. 186). But more on that later. Mr. Richter offers two answers to this vexing and complex question.

How much punishment is **<u>sufficient</u>** for John Richter? The answer is none. This case itself has been punishment enough. John has a conscience, and he has suffered for his bad choices. He has suffered a deprivation of liberty through pretrial release conditions. He has suffered financially by spending money that his family didn't have attending court proceedings in Washington, D.C.—money that would have otherwise have supported his wife and children. He has suffered embarrassment, scorn and ridicule as it became known in the community that he was one of the 'January 6th insurrectionists' who betrayed the country. He has suffered with the knowledge that he betrayed his duty as a patriotic American to respect the democratic process. But the most severe punishment of all ahs been, and remains, the disappointment and harms he has caused his family.

What is also apparent is that John Richter has absolutely accepted responsibility for his actions. He stands convicted of misdemeanor entering a restricted building, misdemeanor disorderly conduct in a restricted building, misdemeanor entering the floor of Congress, misdemeanor disorderly conduct in the Capitol Building, and misdemeanor demonstrating in the Capitol Building. When interviewed

by the FBI, John admitted being in the Capitol on January 6th, and certainly never argued that his presence there was lawful in any way. At trial, through undersigned counsel, John only argued that he was not guilty of the felony charges—we did not contest the misdemeanors at trial. Had John had the option of pleading guilty before trial to the misdemeanors listed above, he would have done so, obviating the need of his trial.

Whether the Court grants John a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. §3E1.1 does not ultimately affect his 0-6 guideline range or his placement in Zone A. That decision is therefore perhaps less important than the factual recognition that John has accepted responsibility for his actions. John's sentencing video shows the sincerity of that acceptance, and how he had done his best to learn from his wrongful choices while ensuring that his children avoid his unlawful conduct. John's trial defense shows that he never sought to avoid responsibility for what he was actually guilty of—trespassing and demonstrating in the Capitol grounds, the Capitol Building and the Senate Chamber. At trial, we only defended against the felonious conduct that John was not guilty of.

It is also noteworthy that John has not attempted to politicize this case. While we sought to delay this case pending the Supreme Court decision in *Fischer*, that effort was a legal one, not a political one. Pre-trial, we never raised any First Amendment defenses. At trial, we made no effort to inject politics into John's case. The government did—we didn't. Post-trial, we have done nothing to politicize this case—John has not sought to delay his sentencing in the hope of securing a pardon. His post-trial motions were based on *Fischer* and its legal import—not politics. In all aspects of his life, including this case, John has worked to distance himself from politics rather than immersing himself deeper in politics.

The John Richter of January 6, 2021, is a very different person than the person who will be standing before the Court on December 20, 2024. In fact, the January 6th John Richter is a very

different person than the John Richter that joined the Army at seventeen, or the man that served two combat tours in Iraq, or the man that built a loving family in the aftermath of his honorable disability-related discharge from the Army. The January 6th John Richter did not exist before the 2020 election cycle, and the January 6th John Richter was all but a memory by the time of the Biden inauguration. The January 6th John Richter is now long gone, and will not be in Court on December 20th. Because that John Richter is forever gone, the Court cannot punish that John Richter. On December 20th, the Court can only punish today's John Richter. But today's John Richter is completely rehabilitated. He has reflected on his conduct during the 2020 election cycle. He has spent the time understanding why he allowed himself to be affected by the MAGA echo chamber, and how he ended up in the Senate Chamber on January 6th. He has taken important steps and made necessary changes in his life to avoid falling into a similar trap again. And he has come to grips with his moral culpability for the harm that he did to his country. The knowledge of the harm John did weighs on him, and has been considerable punishment already.

The December 20th John Richter needs no punishment, for he has already been punished. That punishment has been more than sufficient to deter John from ever thinking about similar conduct in the future. That punishment has been more than sufficient to protect the public from John—a man who had committed no criminal conduct before January 6th, and a man who will never commit any criminal conduct during the rest of his life. When the entirety of John's life is placed under the microscope, it is readily apparent that the vast majority of his time on Earth has been spent as a protector of others, not someone to be protected against. The guidelines themselves suggest that no further punishment is necessary. (*See* U.S.S.G. §5C1.1, commentary note 10). The John Richter standing before the Court on December 20th needs no term of incarceration as punishment, and probation is sufficient for him.

But we recognize that some of the 18 U.S.C. §3553(a) factors consider societal issues larger than just John, such as general deterrence, respect for the law, reflecting the seriousness of the offense and avoiding unwarranted disparities. January 6th was a dark day for the country as a whole and more specifically for those living and working in and around Washington, D.C. Should the Court evaluate those societal factors and conclude that they call out for punishment beyond that necessary for John Richter individually, the question then becomes how much punishment is necessary. The Probation Office suggests that four months is the correct answer. Respectfully, four months' incarceration is greater than necessary.

John Richter has no prior criminal history—not even an arrest. The conduct that he actually committed was misdemeanor conduct. According to the Guidelines, incarceration is generally inappropriate for similarly situated defendants. According to the JSIN data, over the last five fiscal years, there were ninety-five defendants sentenced pursuant to U.S.S.G. 2A2.4 with a Total Offense Level of 8 in Criminal History I, after U.S.S.G. §5K1.1 were excluded. Thirty-seven of those defendants (39%) received no term of incarceration. Fifty-eight of those defendants (61%) received a sentence of imprisonment in whole or in part. Of those fifty-eight defendants, the average term of imprisonment was four months and the median term of imprisonment was two months. When all 95 defendants were considered, the average term of imprisonment was three months and the median term of imprisonment was one month. (PSR at ¶195).

When evaluating similarly situated defendants, the Court should consider all ninety-five similarly situated defendants, and not just the fifty-eight defendants that received a sentence of incarceration. Mr. Richter has presented a reasonable case for non-incarceration, and it is readily apparent that numerous others did as well, since thirty-seven similarly situated defendants received no term of incarceration. Considering only those receiving terms of incarceration unfairly places a heavy thumb on the scales of justice. In looking to the data reflecting all ninety-five defendants, the

median of one month is a more valid indicator than the average of three months. The fact that the average is three times that of the median demonstrates that there were a fair number of outliers that skewed the average number significantly higher than the median number. The median, on the other hand, shows that half of those sentenced received more than one month of incarceration, while half received less than one month of incarceration. It reflects a far more insightful calculation than does the skewed average.

For these reasons, the Court should look to the median sentences received by similarly situated defendants. The most accurate comparison considering all ninety-five defendants would suggest one month of incarceration would not be greater than necessary. Even if the Court limits its consideration of similarly situated defendants to the fifty-eight receiving sentences of incarceration, the median term is two months. Using these median terms as guideposts suggest that any term of incarceration exceeding two months would be greater than necessary.

There are significant mitigating factors present here demonstrating that any sentence greater than fifty-nine days of incarceration would be greater than necessary, including but not limited to:

1. John's history of military service including two combat tours of duty in Iraq (*see also* U.S.S.G. §5H1.11);

2. John's history of Traumatic Brain Injury and the permanent cognitive difficulties caused by those injuries (*see also* U.S.S.G. §5H1.3);

3. John's history of Post-Traumatic Stress Disorder and the resulting psychological difficulties caused thereby (*see also* U.S.S.G. §5H1.3);

4. John's medical difficulties, including his chronic and debilitating migraine headaches (*see also* U.S.S.G. §5H1.4);

5. John's lack of criminal history, including a lack of arrests;

6. John's genuine remorse for his actions combined with his post-offense rehabilitation;

7. John's admission to law enforcement that he trespassed and demonstrated at the Capitol when interviewed;

8. John's concessions at trial that he was guilty of the misdemeanors for which he faces sentencing;

9. John's disengagement from politics;

10. John's family support; and

11. John's absolute compliance with conditions of release during the two years he has been on release conditions.

There is another factor that mandates the conclusion that a sentence of sixty days or more is greater than necessary—the utter devastation that a sixty-day sentence of incarceration would cause for John's wife and children.

John's military disability payments and military insurance provide the majority of the financial support for Megan and the children. While Megan works as a server in a restaurant, and the family needs that financial support to maintain their home, the loss of John's disability payments and insurance will leave Megan and the children homeless.[14] If John is sentenced to sixty days or more of incarceration, his disability status, and any resulting payments, will be cut off. If his disability status

---

[14] In reviewing materials in anticipation of the December 20th sentencing hearing, undersigned counsel noted one additional error that had not been pointed out previously to the Probation Office or government counsel. At ¶130 of the final Presentence Investigation Report, the PSR lists Mr. Richter's wife's income. (*See* PSR at p. 26). It appears that Mr. Richter and/or undersigned counsel may have misunderstood certain questions or otherwise unwittingly provided erroneous information. On December 16, 2024, undersigned counsel communicated with Megan Richter who looked up her year-to-date earnings (through the second week in December) and confirmed that she earns approximately $800 per month in base wages and $1,500 per month in tips, for a total of approximately $2,300 per month. That number coincides with that reported in the PSR as "Base Pay." (PSR at p. 26). The $3,200 listed as "Tips" is erroneous. The Richter's total monthly income is thus approximately $3,200 less than that reflected in the PSR. Their monthly cash flow is essentially zero, which means that their expenses consume everything that both John and Megan bring in.

For these reasons, the PSR correctly determines that Mr. Richter is unable to pay a fine (PSR at ¶155) and the government's assertions to the contrary are incorrect. (ECF No. 186 at 60-61).

were only suspended while he was incarcerated, the family might be able to survive the suspension of benefits. But that is not how it works. Instead, his disability status would be terminated, meaning that the military would no longer consider him disabled. Upon his release from incarceration, John would then have to reapply for disability, possibly undergo new medical, neuropsychological and psychological evaluations, submit additional documentation and evidence, and wait.

And then they would wait some more, hoping that John's disability status would be reinstated—a hope that would not be guaranteed. But whether restoration would take months or years, those benefits would not be reinstated in time for the Richter family to save its house. The house would be foreclosed on and lost. Their van would likely be repossessed, since they would not be able to continue to make payments on their auto loan. The family would be homeless. Although the Richter's relocated to Florida several years ago, they do not have extended family in Florida, as their extended family remains in the Kentucky area. In addition to the children being torn from their home, they would likely have to relocate from Florida to Kentucky, and try to settle into a new routine of unfamiliar schools without the comfort of friends—perhaps without their father should he remain incarcerated for an extended period.

As set forth herein, a probationary sentence is sufficient to punish John Richter. But if the Court feels that societal factors beyond John Richter require a term of incarceration as punishment, sixty days of incarceration (or more) is greater than necessary. Sixty days will leave Megan, the children and John in utter ruin. What they have worked to construct over the past years—years before the 2020 election cycle and years after the 2020 inauguration—will forever be gone. Economic devastation and homelessness for Megan and the children is unduly punitive and greater than necessary under 18 U.S.C. §3553(a).

That unduly punitive and excessive punishment is not required by the guidelines, nor do the guidelines suggest that four months' incarceration is necessarily appropriate. Instead, the guidelines

call for a sentence in the 0-6 month range. Further, as a general matter, the guidelines suggest that first-time offenders such as John whose guideline range falls in Zone A should not receive a term of incarceration. Thus, if anything, the Guidelines suggest that sixty days or more of incarceration are likely excessive and greater than necessary. A sentence of 59 days or less of incarceration falls well within the 0-6 month guideline range, and is more consistent with the commentary indicating that incarceration for offenders like John is generally inappropriate.

The within-guideline sentence requested—a sentence of 59 days or less of incarceration—is consistent with the misdemeanor statutes of conviction, the Sentencing Guidelines[15] and the JSIN data. The Court has considerable flexibility in sentencing John, including flexibility to avoid the financial devastation facing the Richter family should he be sentenced to sixty days or more of incarceration. If the Court sentences John to a term of incarceration of fifty-nine days or less, the Court can sentence John to a term of supervised release of up to one pear. (PSR at ¶164). If, on the other hand, the Court sentences Mr. Richter to probation, as requested herein, the Court can impose a term of probation of up to five years. (PSR at ¶173). Based on the totality of the circumstances of this case, a lengthier term of supervision has far greater benefits for society, the justice system and John than does a short term of incarceration followed by a short term of supervision. A lengthier term of supervision allows the Court to continue to monitor John to ensure that nothing like the conduct at issue ever occurs again. And should such conduct reoccur—a probationary sentence allows the Court to sentence John appropriately and punitively, in the unlikely event that John were to violate his conditions of probation with new criminal conduct.

While on supervision, the Court has a number of options available to it to craft unique conditions specifically tailored to John Richter. For example, if the Court feels that some restrictions

---

[15] *See* U.S.S.G. §5B1.1(a)(1).

on John's liberty are necessary to carry out a punitive function, the Court could impose a term of home detention or home incarceration as a condition of either probation or supervised release. Should such a condition be imposed, we would suggest that home detention be utilized rather than home incarceration, in order to allow John to continue to play his family role of taking the children back and forth to school and other activities. But whether styled as home detention or home incarceration, the Court could impose, hypothetically, the four-month term suggested by the Probation Office as a condition of home detention while on probation,[16] rather than as a term of imprisonment which would render Megan and the children homeless.[17]

The Court has options in sentencing John Richter as other than just incarceration. In addition to home detention (or even residential reentry center time) as a condition of release, the Court could impose a term of community service. Ultimately, John could do more good for society through community service than he could while warehoused in a detention center or prison. Additionally, the Court could impose additional conditions such as mental health conditions and the like.

---

[16] It appears that time spent at a residential reentry center would not disentitle Mr. Richter to military benefits. Thus, the Court would also have the option of including, as a condition of probation or supervised release, time spent at a residential reentry center. We are not suggesting that the Court utilize that option, because we feel that home detention would be a better use of discretion since home detention would allow Mr. Richter to continue to serve his family by taking the children to school, picking them up, etc. But if the Court were to conclude that home detention was not sufficient, we would ask the Court to consider a probationary/supervised release condition requiring service of time at a residential reentry center, as opposed to a term of incarceration. *See generally* https://www.benefits.va.gov/persona/veteran-incarcerated.asp (last accessed December 16, 2024).

[17] In fact, the Guidelines suggest that such conditions may be appropriate for those defendants placed in Zone B. *See* U.S.S.G. §5C1.1(1)-(3). For those in Criminal History Category I, Zone B extends from total offense levels of eight to eleven. A Total Offense Level of 11 in Criminal History Category I would result in a guideline range of eight to fourteen months. Thus, even if John were facing a sentencing range more than double what he is facing, the Guidelines suggest a home detention condition may be appropriate.

*By three methods we may learn wisdom: First, by reflection, which is noblest; Second, by imitation, which is easiest; and third by experience, which is the bitterest.*
—Confucius

The 2024 John Richter has learned many hard lessons—by each of the means spoken of by Confucius. The easiest method for achieving wisdom is through imitation, and John has learned valuable lessons via that technique.

In the leadup to January 6th, he accepted the articles he read without questioning. He listened uncritically to the words he heard from MAGA sycophants and watched far-right videos credulously. Any information which did not conform to his preconceived notions of "truth" were immediately gainsaid without further thought. And after immersing himself in this maelstrom, John took the easiest route—he imitated what he saw, heard and read. He parroted the disinformation spun as fact, rather than question the fanciful nature of what was fed to him. And yes, he imitated the manner and tone through which that propaganda was expressed.

John was hardly the first person to use inflammatory rhetoric and imagery in the leadup to January 6th. The then-President was a serial offender, as were others such as Steve Bannon, Rudy Giuliani and their ilk. John was, to a great extent, repeating by rote the utterances of those he then trusted and believed.  It was easy to imitate. The Trump sycophants were expressed an uncomplicated, albeit misguided, message. They did so in markedly consistent tones—loudly, aggressively and forcefully, with an absolute faith in the righteousness of their unrighteous cause.

John's imitations of others was not limited only to words. He imitated actions as well. On January 6th, when others walked to the Capitol, he followed the crowd. When others traversed the Capitol grounds to approach the building, he followed the crowd. When the building was breached and others entered, he followed the crowd. When the crowd poured down the hallway and entered the Senate Chamber, he followed the crowd. It is important to note that John's imitation had limits

34

however. When others violently confronted law enforcement, John did not. When others vandalized the Capitol building, John did not. When others rifled through desks and sifted through papers, John did not. Even when immersed in neck-deep in the MAGA vortex, John had his limits.

Despite his refusal to engage in violence or vandalism, John's imitation has led him to exactly where he finds himself today—facing sentencing for criminal misdemeanors before this Court. Many of those that he imitated have avoided a similar fate, much to John's chagrin. John is by no means innocent of those misdemeanors, nor has he (through counsel) ever argued to this Court that he was. His choice to imitate the words and deeds of others have had destructive consequences for both John and his family. And those consequences result from his unwavering acceptance of far-right propaganda. John has learned powerful lessons from his misguided imitation of others.

John has also bitterly learned from his experiences facing the consequences of his actions on January 6th. Refusing to recognize that the rule of law applies to everyone equally, regardless of subjective beliefs, has led him t where he is today. Failing to critically examine a myriad of arguments and opinions led him to knee-jerk acceptance of dogmatic absolutes. That unquestioning acceptance caused him to take actions that have brought he and his family to the brink of collapse. It is entirely possible that his choices on January 6th could land him in prison.  A prison stay will render John and his family homeless. If so, all they spent years building will be torn asunder. John gained nothing from January 6th, but runs the risk of losing everything he holds dear. Experience truly provides the bitterest lesson.

Noble reflection has also brought wisdom to John. John has had several years to reflect on what he did on January 6th, question why he did it, and learn from the bad choices he made. That reflection has caused John to make numerous changes in his life. John has learned to question what he reads, hears and sees. Rather than simply accept an article or argument, John has learned to question implicit assumptions, read alternative points of view and ask hard questions. John has also, to a large

extent, disentangled himself from politics. While he still considers himself a proud American with patriotic views, he no longer spends inordinate amounts of time scouring the internet for political articles and chat groups. He has learned that he can remain informed about current events without becoming obsessed with them.

More importantly, John has begun to recognize the destructive effect that social media can have. Seeing some of his social media videos presented as exhibits during this trial was a shock to John's system. John has never viewed himself as a threatening, violent person. Seeing himself through the eyes of strangers viewing his videos was a wakeup call. Toward that end, he has largely disengaged from social media. To the extent that he maintains a social media presence, that presence allows him to stay in contact with friends and family—but he no longer engages in political activities on social media. John recognizes the cyclical effect the echo chamber of social media had on him, and he wants no part of it. He has also recognized that perceptions matter, and no longer engages in incendiary rhetoric and imagery designed purely to shock.

Finally, John's retrospection has led him to shift his focus from larger, worldwide issues to those matters of greatest concern to him—his wife and his children. Rather than spending hours producing and editing videos, or reading internet articles and making comments and engaging in debates, John focuses his time, effort and attention on his family. He is far more present than he was in 2020-21 and takes solace while finding happiness with and through his relations with his family. While his immersion in politics brought angst and strife to his life, his reconnection with family have brought him peace and comfort.

John has learned much and gained wisdom through imitation, experience and reflection. The man he is today bears fleeting resemblance to the man he was on January 6th. Today, John Richter would stay home with his family rather than travel to Washington D.C. Today, John Richter would not spend his time even watching the Trump rally on the phone. Today's John Richter draws and

shares strength from his family, and avoids the divisiveness and negativity he previously wallowed in. Unlike many, John has truly learned the proper lessons from his involvement in the events of January 6th, and would never repeat his misguided choices.

For the reasons set forth herein, as supplemented by Mr. Richter's sentencing video and statements to be made at the upcoming sentencing hearing, Mr. Richter respectfully requests that he be sentenced as follows:

1. To a term of probation of no more than five years (or alternatively to a term of incarceration of no more than 59 days followed by no more than twelve months of supervised release);

2. Reasonable conditions of probation (or supervised release, as applicable);

3. The waiver of a fine; and

4. An $80 special assessment.

DATED: December 17, 2024          Respectfully submitted,

MATTHEW CAMPBELL
Federal Public Defender
s/ Matthew Campbell
Office of the Federal Public Defender
1336 Beltjen Rd., Suite 202
St. Thomas, USVI 00802
Tel: (340) 774-4449
Email: Matt_Campbell@fd.org
Counsel for Defendant John Joseph Richter